FREDERICK A. BRAGG

*v.*

PETER GEDDES *et al.*

1.　CONTRACT—*prior and contemporaneous verbal agreements merged in written contract.* A written agreement for the dissolution of a partnership, and disposition of the property and effects of the firm, operates as a merger of all prior and contemporaneous agreements respecting the same matters, and supersedes them.

2.　WITNESSES—*parties in chancery—competency.* Under the old chancery practice a complainant might obtain an order of course to examine a defendant, and a defendant a co-defendant as a witness upon an affidavit that he was a material witness, and was not interested on the side of the applicant in the matter as to which he was proposed to be examined. If, however, he was interested on the side of the applicant, his evidence could not be admitted.

3.　On bill against the trustee of a legatee under a will and the legatee and others, to establish a partnership between the complainant and the testator with two of the other defendants, and for an account, praying that the trustees be decreed to pay over to the several partners the respective sums that might be found to be due to each on final accounting, it was held that the defendant copartners were not competent witnesses, under the statute, in behalf of the complainant to testify to facts occurring before the death of the deceased partner and to declarations and admissions made by him.

4.　PLEADING AND EVIDENCE—*facts denied by answer.* Where a material allegation of a bill in chancery is positively denied by answer under oath, it must be established by proof sufficient to overcome the answer and opposing evidence.

5.　EVIDENCE—*witness' inference from what party said.* The testimony of a witness that he took from what a party said, that such party and another were partners, etc., is not evidence. It is mere impression or inference.

6.　SAME—*admissions of person incompetent to testify.* Where a party to a suit is incompetent as a witness to testify against a co-defendant, his acts and

declarations are not admissible to prove anything as to which he is not competent to testify.

7. SAME—*admissions by trustee as against cestui que trust.* A party defending as the trustee of another can not make any admission to the prejudice of the trust fund and against the *cestui que trust.*

8. SAME—*admissions—weight as evidence.* Verbal admissions of a party ought to be received with great caution. Such evidence is subject to much imperfection and mistake, and frequently is entitled to but little weight.

9. RESULTING TRUST. There can only be a resulting trust where property is acquired and held in the name of one person, which in equity belongs to another. Where property is given to one there can be no such trust for another.

APPEAL from the Appellate Court of the First District; the Hon. THEODORE D. MURPHY, presiding Justice, and the Hon. GEO. W. PLEASANTS and Hon. JOS. M. BAILEY, Justices.

Frederick A. Bragg filed his bill in equity in the Superior Court of Cook county, on the 25th day of May, 1876, against Peter Geddes and John Sheriffs, executors of the last will and testament of James Smith, deceased, William B. Smith, son and legatee of said James Smith, deceased, James Steele, and Joseph R. Putnam, administrator of the estate of Tarleton Jones, deceased, for an account and settlement of partnership transactions.

It is alleged that in the spring of 1868 the complainant, and James Smith, now deceased, entered into a copartnership, for a term of three years, for the purpose of carrying on "a general business as real estate brokers, in the city of Chicago, buying and selling real estate on account of said copartnership, and on commission, negotiating loans, buying and selling real estate securities, paying taxes, and all other matters and things that usually pertain to the operating of a general real estate agency, and loan and brokerage business." The name and style of the copartnership was "F. A. Bragg & Co." The complainant was to have the exclusive management of the business, and was to devote his entire time, attention, skill, knowledge and influence thereto, which was his

contribution to the capital stock of the copartnership, in lieu of
money, and for which he was to receive one-third of the profits
arising from the business, and a one-third interest in all the
investments of the copartnership made on their own account.
Smith was to contribute to the copartnership business all the
cash capital needed in and about the business to enable the
complainant to purchase, on account of the copartnership, at
the most favorable and profitable bargains that might offer,
real estate, within a reasonable amount; and Smith was to
have two-thirds of the profits of the business and two-thirds
of the real estate purchased on account of the business; that
upon the execution of the written contract for the copartner-
ship the complainant rented and fitted up, at a large expense,
an office, and opened the same for said copartnership business,
under the said firm name and style of F. A. Bragg & Co.;
that "through the influence, constant exertion, skill, manage-
ment and industry of the complainant, the copartnership
business became well founded, and was constantly increasing
and growing;" that in the fall of 1868, while said business
was increasing and becoming more prosperous, said Smith
and the complainant became "satisfied that safe and most
profitable investments could be made in mineral lands" in
the Territory of Utah and its vicinity, and the complainant
was induced to advise that F. A. Bragg & Co. should become
interested in and operate mining lands in Little Cottonwood
mining district, in the Territory of Utah, where successful
prospecting and testing was being carried on, being in the
same locality where the "Emma" mine, so called, was subse-
quently discovered; that it was thereupon agreed by com-
plainant and Smith, as copartners as aforesaid, to enter into
said mining speculations; that complainant presented the
subject of investing in said mineral lands to James Steele,
Tarleton Jones and John Sheriffs, and thereupon the said
firm of F. A. Bragg & Co., consisting of the complainant
and said Smith, and said Steele, Jones and Sheriffs, agreed to
unite and embark in said mining speculations; and that all

the mineral lands bought by said parties should be for the mutual benefit, share and share alike, of said Smith, Steele, Jones, Sheriffs and the complainant; that the said office of F. A. Bragg & Co. was to become the office of the new combination, and was used by them, free of charge, so long as the firm of F. A. Bragg & Co. continued; and, after the dissolution, the private office of the complainant was made and constituted the office of the new copartnership.

It is further alleged, that Steele, Jones and Sheriffs paid into the firm of F. A. Bragg & Co., for the purpose of investment in said mineral lands, from time to time, considerable sums of money, and that the firm of F. A. Bragg & Co. paid its proper proportion of the amount of money to be raised for the purpose of investing in said mineral lands, and prospecting and operating the same—all of which was to be invested in the interest and for the benefit of said F. A. Bragg & Co., Steele, Jones and Sheriffs, under the arrangement and agreement before stated; that in the month of October or November, 1868, complainant caused to be entered in the names of James Smith, James Steele, Tarleton Jones, John Sheriffs and complainant, jointly, certain claims to mining lands in the Little Cottonwood mining district, which were known and designated as the "Minna and Minerva" mining claims or lodes; that in April, 1869, complainant, Smith, Steele, Jones and Sheriffs agreed that Smith should go to Utah to investigate, develop, operate, buy and sell mining claims and lands as the same might appear for the best interests and benefit of all parties concerned; that it was thereupon agreed between complainant and Smith that they would close their real estate partnership business, and dissolve the said partnership as entered upon in the spring or summer of 1868, for the purpose of carrying on a real estate business in the city of Chicago, as before stated, for the purpose of consolidating and utilizing all the time, efforts and skill of the complainant, as well as said Smith, in the direction of prosecuting the said mining interest; that Smith proposed that, if com-

plainant would consent to and close the real estate business
and firm of F. A. Bragg & Co., so far as the same related to
real estate in Chicago, so that Smith could devote himself and
his spare means entirely to the more extensive copartnership
of mining and mineral lands, so that he (Smith) could remove
to Utah as the representative of the joint interest of that co-
partnership, then, and in that case, complainant should have
his equal share with said Smith, Steele, Jones and Sheriffs,
and a joint interest in all purchases or investments made by
Smith in the Territory of Utah, and in profits to accrue there-
from; and that, in all of the same, complainant, Smith, Steele,
Jones and Sheriffs were to have an equal interest and benefit,
jointly, share and share alike; that in consideration thereof,
on the first day of May, 1869, the copartnership of F. A.
Bragg & Co., so far as the same related to real estate invest-
ments in Chicago, was dissolved, and complainant, afterwards,
relinquished to Smith all of his interest, of every kind, in
certain investments which complainant had made for the firm
of F. A. Bragg & Co., and out of which large profits have
accrued to Smith, in his lifetime, and since his death; that
complainant, as a further consideration for the dissolution,
and as a part of his contribution to the mineral and mining
copartnership business, borrowed or negotiated for Smith a
large loan, without commission, to take to Utah, in considera-
tion of all which Smith agreed with complainant faithfully
to represent and advance the interest of the complainant in
Utah, and that complainant was to have an equal undivided
one-fifth of all the lands and claims entered or bought by
Smith in said territory, and was to have one-fifth interest in
all mineral and mining interests, claims, lodes, or mines of
any kind or nature whatsoever, in which said Smith might
invest, purchase, or take an interest; and Smith agreed with
complainant that, in consideration of the matters aforesaid,
he would advance for complainant, from time to time, what-
ever money might be required to keep and preserve complain-
ant's interest in all the mineral and mining claims that they

had acquired, as well as in what should be acquired, and also upon any mining enterprise that might or should be undertaken by said Smith, while in the Territory of Utah, and that the interest of complainant in all should be equal to that of Smith and each of the other parties before named; that in consideration of the agreement of Smith, and the other persons named, complainant did, afterwards, convey and release large and valuable interests and investments, made for said firm, to said Smith, and did procure a loan of $6000 for Smith, without commission thereon; that in the month of May, 1869, Smith went to the Territory of Utah as a copartner and representative of complainant and Jones, Steele and Sheriffs, and at the mutual expense of each of said copartners, with instructions to invest in any valuable mining claims that he might be able to purchase, and to develop and operate the same, if the same could be had and operated at a reasonable price, and within the means of the copartners, and especially to develop and test the " Minna and Minerva " mines.

It is further alleged that Smith, upon his arriving at Utah, abandoned the said "Minna and Minerva" mining claims, and squandered his money in extravagant living and idleness, much of his time being in an intoxicated condition, and in January, 1870, returned to Chicago for more money, and for consultation with the members of the copartnership; that he then induced the copartnership, or the members thereof, to make further advances of money to him, and again returned to Utah in April, 1870; that the money thus advanced to Smith was paid in equal proportions by Smith and the complainant, and Steele, Jones and Sheriffs, and that upon Smith's returning to Utah he purchased of one Robert Bruce Chisholm, and one Woodman, a one-fourth interest in a certain mine then undeveloped, known and called the " Emma " mine, for $200; that the $200 paid by Smith therefor was furnished and advanced to him by said copartners, and that Smith invested the same in the interest of and as the agent of the copartnership; that Smith, in violation of his agreement with

his copartners, and the trust by them reposed in him, took the said one-fourth interest in the said "Emma" mine and the title thereof in his own name, and thereby became, in law, a trustee for the copartnership.

It is further alleged that said mine proved a source of great profit, and Smith derived great gains therefrom; that from that time, until his death, Smith remained out of the State, intentionally, for the purpose of avoiding a settlement with his copartners; that Smith died testate, and left all of his fortune, consisting of the proceeds of said "Emma" mine, to Peter Geddes and John Sheriffs, his executors, as trustees for the benefit of his son, William B. Smith.

The bill prays for answers under oath, and that an account be taken of the copartnership, etc., and that Geddes and Sheriffs be decreed to transfer to complainant and the other copartners their respective shares of the copartnership estate which they received from Smith.

The bill was sworn to by the complainant.

The joint and several answer of Geddes and Sheriffs admits the entering into copartnership by complainant and Smith, on the 8th of July, 1868, at Chicago, for the purpose of buying and selling real estate, etc., as alleged in the bill; they also admit that the office of such copartnership was kept at the place alleged, but they deny that the firm of F. A. Bragg & Co., (composed of complainant and Smith,) and said Steele, Jones and Sheriffs agreed to unite and embark in mining speculations, and that all the mineral lands bought should be for their mutual benefit, share and share alike, as alleged; they also deny that said office of F. A. Bragg & Co. was to or did become or was used, as alleged, as the office of the alleged copartnership, or that it was so used after the dissolution of the firm of F. A. Bragg & Co. They can not answer whether Steele and Jones paid into the firm of F. A. Bragg & Co., for the purpose of investment in mineral lands, any sums of money, but Sheriffs, on his own knowledge, and Geddes, on information and belief, deny that Sheriffs ever paid into said firm of F.

A. Bragg & Co. any money, at any time, for said purpose. They, on information and belief, deny that the firm of F. A. Bragg & Co. paid any money as a proper proportion of an amount to be raised and paid as alleged. The defendants deny, on information and belief, that, at the time alleged, said Bragg entered or caused to be entered, in the name of Smith, Steele, Jones, Bragg and Sheriffs, jointly, said "Minna" and "Minerva" mining claims or lodes, and said Sheriffs, on his own knowledge, and said Geddes, on information and belief, deny that in April, 1869, or at any time, complainant, with said Smith, Steele, Jones and Sheriffs, agreed that Smith would represent the mutual and joint interest of said parties, and would go to Utah to investigate, develop, operate, buy and sell mining lands and claims as might appear for the best interest and benefit of all said parties as alleged.

The defendants, on information and belief, say that on or about the first day of May, 1869, Smith and complainant united in the execution of certain articles of agreement of that date, a copy of which is annexed to the answer, and thereby and for the consideration therein expressed, and for none other, terminated and dissolved their copartnership.

They also deny, on information and belief, that complainant, as a further consideration for the dissolution of his and Smith's copartnership, and as a part of his contribution to the alleged mineral and mining copartnership business, borrowed or negotiated for Smith a large loan, without commission, to take to Utah, and deny that for the consideration alleged, or otherwise, Smith agreed with complainant faithfully, or otherwise, to represent and advance complainant's interest in Utah; and further deny that complainant was to have an equal one-fifth of all the lands and claims entered or bought by Smith in said territory; and they also further deny that complainant was to have one-fifth interest in all mineral and mining claims or enterprises, as alleged; and deny that the parties named, by agreements and undertakings as alleged or otherwise, constituted or created a copartnership for mining purposes, as alleged;

and deny that thereby, or otherwise, complainant, Smith, Steele, Jones and Sheriffs became and were joint owners and copartners of all mineral and mining interests of every kind, etc., acquired by Smith, during his lifetime, in the territory of Utah, or by any other of the so-called partners.

They further say, on information and belief, that by the agreement of dissolution, the mining interest of complainant was expressly limited to an interest in the " Minna and Minerva " lodes, therein named. They deny that Smith, at any time or in any manner, acquired any interest whatever in said "Emma" mine, with money furnished by the alleged copartnership, or as its agent or representative, or in its interest, or in the joint interest of the alleged copartners; and they affirm, on information and belief, that all the interest in the "Emma" mine ever had, or held, or owned by Smith, was acquired out of his own means, and, at all times, held and owned by Smith, for himself, alone, and that complainant never, at any time, had any right, title or interest therein, etc.

This answer was properly sworn to.

Subsequently, by leave of the court, they filed sworn amendments to their answer, denying that after the dissolution of the real estate copartnership between complainant and Smith, a meeting composed of complainant, Smith, Jones, Steele and Sheriffs was held, at which it was agreed or determined that Smith should proceed to the Territory of Utah for the purpose of developing said " Minna and Minerva " mines, and that the expenses incurred by said Smith should be paid by the parties, members of the alleged copartnership, or that it was agreed at such meeting, or at any other time, that all mining property acquired in any manner by Smith, while acting as agent and partner of the alleged copartnership, should be for the benefit and to the use of the alleged copartnership, consisting of Smith, Jones, Steele and Sheriffs and the complainant. And Geddes, upon information and belief, and Sheriffs, upon his own knowledge, deny that Jones, Steele, Sheriffs, Smith and complainant held any meeting whatever, for any purpose, or

at any place during the month of May, 1869, after the dissolution of the real estate partnership theretofore existing between complainant and Smith.

They further answer, on information and belief, that Smith, before his return to Utah, in April, 1870, informed complainant, Steele and Jones that he had an interest in the "Emma" mine, which had been given to him as a present; that he held and claimed such interest as his individual property, and that no other person or persons had any interest therein or claim thereto ; that complainant took no steps to assert any title to or claim in said interest in the "Emma" mine, held by Smith, until it was reported the mine had been sold to one Ralston of California, for a large sum of money. William B. Smith's answer, on information and belief, denies the material allegations in the bill, in regard to the "Emma" mine, and puts them in issue.

Steele and Jones also answered, but, in the view expressed in the opinion, their allegations are immaterial.

Proper replications were filed to the answers.

On final hearing, the Superior Court decreed in favor of the defendants and dismissed the complainant's bill.

The complainant, thereupon, appealed to the Appellate Court of the First District. That court, on hearing, affirmed the decree of the Superior Court, and the complainant now brings the record to this court, by appeal, and assigns for error:

1st. That the Appellate Court erred in affirming the decree of the Superior Court.

2d. The Appellate Court erred in not reversing the decree of the Superior Court.

Messrs. G. W. & J. T. KRETZINGER, and Mr. VICTOR MORAWETZ, for the appellant.

Mr. JOHN P. WILSON, for the appellees.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

There can be no question but that all prior and contemporaneous agreements between Bragg and Smith, as to the terms of their agreement of dissolution of their real estate copartnership, are merged in their written agreement. That agreement bears date on the first day of May, A. D. 1869, and, after reciting the formation of the copartnership between them, their agreement to dissolve the same, the property acquired and by whom title is held, etc., proceeds in the following words :

"Now, these presents witnesseth that the said James Smith, in consideration of the premises, and of the sum of one dollar to him in hand paid by the said Frederick A. Bragg, the receipt of which is hereby acknowledged, does hereby sell, transfer, assign and make over unto the said Frederick A. Bragg, and to his assigns, all his, said Smith's, right, title interest and claim in and to the lease of the said room and basement aforesaid, and in and to the chairs, desks, iron safe, and all other furniture and fixtures used in said office or appertaining thereto, to have and to hold the same unto the said Frederick A. Bragg and his assigns.

"And for and in consideration of the premises, and of the sum of one dollar, in hand paid by the said James Smith, the receipt of which is hereby acknowledged, the said Frederick A. Bragg does hereby sell, assign, transfer and make over unto the said James Smith, all his (said Bragg's) right, title, claim, interest and demand, in and to all of the outstanding claims and demands of every sort, commissions, real and personal estate and property, mining lands or interests, notes, bonds or obligations, contracts or property, or claims of any and every description whatsoever, held or owned, or claimed by or due or owing to said firm of F. A. Bragg & Co., saving and excepting the three several parcels of real estate and leases of said office, and the furniture and fixtures of the same, here-

4—93 ILL.

50              BRAGG *v.* GEDDES *et al.*              [Sept. T.

Opinion of the Court.

inbefore particularly described, and the interest in the said Minerva and Minna lodes, hereinbefore particularly described, and in reference to the said hereinbefore described three parcels of real estate, and the said interest in the said Minerva and Minna lodes.

"It is hereby mutually agreed and understood as follows, to-wit:

"1st. That upon the said James Smith being fully reimbursed for all moneys expended by him, or which he may hereafter expend in the payment of the purchase money of, or other outlays in connection with, or on account of the said three several parcels of real estate hereinbefore described, situate in Cook county aforesaid, and the said undivided 600 feet of mining lands situate in Salt Lake county aforesaid, (including the necessary proportion of expenses for developing and working said mining lands,) with interest upon all sums advanced or expended by the said James Smith as aforesaid, at the rate of ten per cent per annum, that said Frederick A. Bragg shall be entitled to one-third of the net profits arising from the sale or other disposition of said three parcels of real estate situated in Cook county aforesaid, and to one-third of the net profits arising from the sale or working of the said mining lands situated in Salt Lake county aforesaid. * * *

"6th. That in the expenditure of money for the development and operations of the mines hereinbefore described, the said Frederick A. Bragg shall be only liable for such *pro rata* proportion of such expenses as his (said Bragg's) undivided one-third interest in said six hundred feet shall bear to the amount expended by other owners for the same purpose, and the said Bragg reserves the right to terminate his liability at any time for further expenses connected with said mines, by giving written notice to the said James Smith."

Very clearly Bragg has no claim to a partnership in Smith's interest in the "Emma" mine by virtue of anything to be found here. Here is an express surrender, by Bragg to Smith, of all his interest in mining lands or interests then owned by

them, except as to the "Minna and Minerva" lodes; and there is no covenant or agreement giving Bragg an interest in such property to be acquired by Smith in the future. Smith's obligations to Bragg, in regard to mining property, as defined by this instrument, are limited to the "Minna and Minerva" lodes.

But Bragg, by his amendment to his bill, made on the hearing, alleges that subsequent to the making of the contract of dissolution, and about the 15th of May, 1869, he and Smith and Jones, Steele and Sheriffs, held a meeting at which it was agreed that all mining property acquired by Smith, while acting in Utah, should be for the benefit of said parties; that the parties should each advance the necessary funds for that purpose, but that Smith was to advance Bragg's proportion, and that pursuant to that agreement Smith went to Utah in the month of May, 1869; that in January, 1870, Smith returned to Chicago, (having wasted and squandered the money previously furnished him,) for more money and to consult with his copartners; that in April, 1870, he was again sent to Utah by his copartners and supplied with funds by advances made in equal proportions by the copartners; and that, upon reaching Utah, in April, 1870, Smith purchased of Robert Bruce Chisholm and Woodman, a certain interest in the "Emma" mine for $200, which sum he paid out of the money advanced by his copartners, etc.

It is necessary to see whether this allegation is sustained by the evidence. Before referring to the evidence bearing upon the question, however, it is proper that we should determine the competency of certain evidence heard upon the trial of the cause in the Superior Court, to which objection was made by the counsel representing the executors and William B. Smith.

The defendants, Steele and Jones, were each examined as witnesses, and permitted to testify to facts occurring before the death of James Smith, and to declarations and admissions made by him.

The case claimed by Bragg is, these defendants were copartners with himself, Smith and Sheriffs; and the prayer of the bill is that upon a final accounting the trustees may be decreed to transfer, deliver and pay over to Bragg, and the other members of the copartnership, the respective interests that may be decreed to belong to each,—so that a decree in favor of the complainant would also be a decree in favor of Steele and Jones.

Under the old chancery practice, it is true, a complainant might obtain an order, as of course, to examine a defendant, and a defendant a co-defendant, as a witness, upon an affidavit that he was a material witness and was not interested on the side of the applicant, in the matter to which it was proposed to examine him. 1 Greenleaf's Evidence, § 361. If interested, however, on the side of the applicant, in the matter to which it was proposed to examine him, his evidence could not be admitted. *Dyer.* v. *Martin,* 4 Scam. 147.

Our statute permitting parties and persons interested to testify in their own behalf makes the exception that "no party to any civil action, suit or proceeding, or person directly interested in the event thereof, shall be allowed to testify therein of his own motion, or in his own behalf, * * * when any adverse party sues or defends as * * * the executor, administrator, heir, legatee or devisee of any deceased person or as guardian or trustee of any such heir, legatee or devisee, unless when called as a witness by such adverse party suing or defending." * * *

Since the adverse parties were to defend as trustees for a legatee, and as legatee, and the co-defendants are, in reality, called to testify in their own behalf, as well as in behalf of the complainant, there can be no pretence for admitting their evidence under that statute, and it should not have been admitted or considered. *Brown* v. *Hurd,* 41 Ill. 121; *Alexander* v. *Crosthwaite,* 44 id. 359.

Recurring, then, to the other evidence, Sheriffs, in his answer, in response to this allegation in the bill, denies it in

toto. There is no evidence sufficient to overcome this answer. The evidence relied upon by Bragg to support his bill in this respect is that of Fitch, Alex. McDonald, Daniel Boone, James Chisholm, Joseph F. Hatch, Philip Wadsworth, Eugene Stickney, Samuel Pease, William Loomis and Henry Fuller. Let the evidence of these witnesses be examined separately, and it will be seen that it falls far short of sustaining this allegation.

Thomas Fitch testified that a letter was written by Smith to Bragg, relating to the purchase of an interest in a mine which he supposed to be the Emma, on account of the co-partnership. All that he says on that subject is this: "Remember one letter particularly, because we relied on it to establish our case. The purport was a brief description of a mine, answering description of the Emma. Smith stated that he had an opportunity to purchase an interest in that mine for a small sum; that he thought it would pay better than their previous investment; that he was going to look at it, and if pleased, would purchase it."

He further says: "The mine described and the locality named tallied with the Emma, and the date answered to the date of the conveyance to Smith of his interest in the Emma."

It will be noted that this is all rather the conclusion or impression made on the mind of the witness than a statement of facts. The letter, if produced, might have created quite a different impression. He does not pretend to give the words of the letter, and he speaks only after the lapse of seven or eight years, during which he seems to have traveled, for some time, in Europe—and once or more times changed his place of business—without giving any very conclusive reason for an accurate recollection of the contents of the letter. That he is mistaken in some respects is clear beyond dispute. He says he delivered to his professional partner, at the same time with this letter, original written articles of copartnership between the parties—that is, as we understand him, between Smith, Bragg, Steele, Jones and Sheriffs. But it is, on all

54          Bragg *v.* Geddes *et al.*          [Sept. T.

Opinion of the Court.

hands, conceded there never was any written agreement whatever between these parties.    He delivered what never existed.

Again, he says the date of the letter answered to the date. of the conveyance to Smith of his interest in the "Emma." But no interest in the Emma was ever conveyed to Smith. He was one of the original locators, and this admits of no controversy.

The fact is, in 1869 Smith acquired an interest in what was called the "Illinois Tunnel," where he spent some time in working, and this was within six hundred feet of the Emma mine; and, from all the circumstances, it is much more probable that it was this to which he alluded than to the "Emma" mine.

Apart from these objections to the evidence, however, it will be observed it is totally insufficient to prove a definite copartnership between Bragg, Smith, Steele, Jones and Sheriffs, formed after the first of May, 1869.    He is not made to say in this letter who are his partners, for whom he intends purchasing, nor what the interest either is to have.    While it might, in a general way, prove that others than himself were interested, it does not necessarily show that Bragg was one of those others.    Alex. McDonald, Bragg's counsel claim, says that Smith spoke in 1869 or 1870 of being interested with Steele, Jones, Sheriffs and Bragg in the "Emma" mine.

The whole of his evidence on this subject, as shown by question and answer, is as follows:

"Q.    8. State if you had a conversation with James Smith as to his business, and as to his partners, or partnership business with Bragg, Sheriffs, Steele and Jones in the years 1869 and 1870?"    (Objected to by defendant's counsel as being incompetent and leading.)

"A.    Well, *if we had any conversation,* it was nothing more than that he told me they were interested in mining business in the Emma mine at Salt Lake.    That is all, and he was very anxious I should sell out and join in there.    I didn't

know what interest they had in the Emma mine, only that they were all interested. They seemed to be his backers."

Did they have any such conversation? The witness does not state. They could not have had such a conversation in 1869, because the proof is clear beyond dispute no interest was acquired by Smith in the Emma mine, at that time.

There is nothing definite or tangible in this. How would it be possible to disprove it? All that is spoken of with certainty is that Smith was anxious that the witness should sell out and join in there,—whatever that may have been,—and Bragg, Steele, Jones and Sheriffs seemed to be Smith's backers. He knows of no contract between the parties, and speaks of no admission defining their several interests.

The evidence of Daniel Boone, relied upon by Bragg's counsel, is that he heard Smith say: "Well, Bragg's interest and mine are mutual."

The date of this conversation is fixed by Boone thus:

" I have taken pains to refresh myself as to the date of the loan. The papers were made out on the 27th of April, 1869. This conversation with Bragg was probably had a week or ten days prior to that."

So, it was prior to the dissolution of the real estate copartnership between Smith and Bragg, and, by no possibility, could prove or disprove an agreement made subsequently to that time. At that time doubtless their interests were mutual.

R. B. Chisholm testifies that in 1869 or 1870 Smith admitted that he and Bragg were equal partners in all mining property he and Smith might acquire in Utah. He fixes this as being while they were in the real estate business, and before Smith went to Utah. It must, therefore, have been before their dissolution, and hence, like the evidence of Boone, it can neither prove nor disprove what subsequently transpired.

Joseph F. Hatch's evidence is, that Smith did not deny the partnership when called upon for a settlement. His full statement, so far as here relevant, is this:

"Smith was sick; saw him once. Asked him if he wanted

56          BRAGG v. GEDDES et al.          [Sept. T.

Opinion of the Court.

to make some arrangement to settle without a suit. He told me to see Marshall and Carter, and I went to see them. Smith did not deny the partnership to me. All I knew of the matter was what I learned after Wadsworth wrote me. Smith, when I saw him, said he had an understanding or agreement with these parties about going out there. He claimed they were interested with him in some mines, but he should fight it as to the Emma mine. Believe he told me the five were interested in the other mines, and the Tunnel—himself, Jones, Steele, Sheriffs and Bragg."

Again, he says: "Don't know that he told me he had partners, but got the impression." And again: "I did not have much conversation with Smith at that time,—he was sick. I spoke to him about these gentlemen furnishing him money. He admitted that, but that was about all he said, and for me to go and see Marshall and Carter, his attorneys."

It is not pretended this latter conversation could have had any reference to Bragg, for he does not claim to have ever furnished any money. So far as the previous admissions of Smith are concerned, which could have reference to Bragg, they are entirely consistent with the articles of dissolution, and do not, therefore, tend to prove a subsequent agreement. Under those articles, Bragg was interested with Smith in some mines in Utah—the "Minna and Minerva." But Smith then, as after, denied that anybody else was interested with him in the "Emma."

Philip Wadsworth says that Smith, in Bragg's office, said, "These boys furnished me the money." But it is not claimed "these boys" included Bragg. He admits that he did not furnish money.

Eugene Stickney, Bragg's counsel say, testifies that Smith went to Utah for the partnership, of which Bragg was the business man, bought a share in the Emma mine, in 1869, and in the transaction used the plural "we" and "us."

Stickney's evidence is that he was present at a conversation between Woodman and Smith in June or July, 1869, when a

proposition was made, and, as he says, accepted by Smith, by which Smith acquired an interest at that time in the "Emma" mine. Woodman directly and unequivocally denies that there ever was such a conversation, and he is corroborated by W. W. Chisholm, and Day, who show that there then was no such thing known as the "Emma" mine.

Bragg's counsel rely on the evidence of Samuel Pease to prove that he had an office with Bragg in 1870, and heard general conversations between Smith and the parties there, that they were jointly interested in mining enterprises. He says that in 1870 he officed with F. A. Bragg & Co., composed of F. A. Bragg and James Smith. It is evident that if he is right in his statement of the persons with whom he officed, he is mistaken in his date. No one pretends that Smith and Bragg had an office in Chicago after their dissolution, May 1, 1869.

He heard casual conversations, evidently having reference to the interests of the parties before the dissolution, but too indefinite to be of any special value, thus:

"Int. 12. What was said as to the interest of Mr. Bragg and Mr. Smith by Mr. Smith, if anything?"

"A. I don't know that anything special was said about Bragg's interest, or Mr. Smith's interest. I understood that they owned some mines together, and were in business together."

So they did, and so they were. They owned, with Jones, Steele and Sheriffs, the "Minna and Minerva" lodes, and they were in business as real estate brokers in Chicago, until their dissolution, May 1, 1869.

William Loomis says Bragg and Smith borrowed money of him for mining purposes. Understood they had equal interests. Smith had been at the mines and wanted to return.

The date of this conversation is not given. The precise questions and answers relied upon are as follows:

"Int. 19. Did he (Smith) say whether any one was interested with him in the mining investments?

"A.   Well, he and Bragg were occasionally talking together in my hearing, and they said 'we,' etc."

"Int. 20.   What, if anything, did Smith tell you with regard to a joint interest?

"A.   Well, I don't know that he said anything in particular about it.   Well, as I understood it, they had equal interests—him and Bragg—something to that effect.   I used to sit and hear them talk, and *I paid no attention to it.*"

Obviously, no great reliance should be placed on such evidence as this.   It proves nothing.

Finally, it is claimed by Bragg's counsel that Henry Fuller testified that he took, from what Smith said, that he and Bragg were partners, and that they had a good mine.   This is not evidence.   It is mere impression—inference.   *What did Smith say?*   We can not know from this.   Mr. Fuller may have drawn a very improper conclusion from the language used.

Sheriffs' declarations are inadmissible to prove the allegations of the bill, even if we conceded them to be to that effect, which we do not.   As a partner, we have seen, he would not be a competent witness, when called against his co-defendant, to establish the partnership, and *a fortiori*, his acts and declarations are not competent for that purpose.   *Bishop* v. *Georgeson*, 60 Ill. 484; *Smith* v. *Hulett*, 65 id. 495.

As a trustee, he could not make any admission to the prejudice of the trust fund and against the *cestui que trust*. *Thomas* v. *Bowman*, 29 Ill. 426.   Same case again in 30 Ill. 84.

The evidence showing how Smith acquired an interest in the "Emma" mine is strongly corroborative of the denial of Sheriffs and Geddes' answers, and is, moreover, of itself, it would seem, sufficient to repel the idea that there could be a resulting trust in the interest Smith acquired in that mine, in favor of Bragg or any one else, for there can only be a resulting trust where property is acquired and held in the name of one person, which, in equity, belongs to another; and this

can not be true of property given to an individual for his own use.

It is in proof that what was subsequently called the "Emma" mine was first discovered by Woodman in August, 1869, though Woodman had been at work prospecting there some time before, and he worked it thenceforth as the "Woodman" mine until in February, 1870, when it was located and recorded as the "Emma." He shows that Smith's interest in that mine was a gift. He says:

" On the 30th day of August, 1869, Capt. Smith went with me to the mine and examined the ore at the mouth, and seemed well pleased. Next day I let him have my horse to go to Salt Lake on his way to Chicago. He expected to return in a month. Walking a little way with him I said: ' Smith I am going to give you an interest in that mine, and if you can loan me some money when you return, to aid me in shipping the ore, why do so.' He thanked me, and said it was more than he expected. According to my promise, I located him 200 feet in the mine in February, 1870. He returned in May, 1870, when I wrote to him, Day and Chisholm, to meet me in Salt Lake. On their arrival, we formed a partnership to work the mine."

He further says, the name " Emma" was never applied to the mine until February 24, 1870.

James M. Day says: " First became interested in the Emma mine about September 1, 1868, through Chisholm and Woodman, as joint locator with them. Assisted Woodman and Chisholm with money to develop the mine till August, 1869, when an ore body was found which constituted the Emma mine. About this time I met James Smith,—found him prospecting different mines. About the middle of November following, met Smith in Salt Lake City; he was then arranging his business matters to go to Chicago to spend the winter. At the same time I learned from Woodman that he contemplated making Smith interested with us in the Emma mine, and to charge him nothing. It was presented to him.

60          BRAGG *v.* GEDDES *et al.*          [Sept. T.

Opinion of the Court.

That information was given me by both Smith and Woodman— that Smith acquired his interest without consideration; he was given to understand what his interest was in February, 1870, when he was placed with the rest of us as locators of the mine. During the summer and fall of 1869, Smith was engaged in mining, superintending the works in the Illinois Tunnel— was also working upon other locations."

Wm. Chisholm shows that in the summer of 1869, Smith worked, first in the Woodhull mine, in Brigham Canyon. In July, he went to Little Cottonwood Canyon to work on a mine called "The Gem." He also worked the same summer on the Cincinnati and Illinois Tunnel, which was about 600 feet from the shaft of the "Emma" mine. Smith first had an interest in the "Emma" mine shortly before its location in February, 1870.

The record of the location of the mine shows that it was located February 24, 1870, and that James Smith was one of the locators.

The evidence is clearly sufficient to overcome the loose general declarations of interest relied upon and which we have examined.

As is well said by Greenleaf, in his work on Evidence, § 200: "With respect to all *verbal* admissions it may be observed that they ought to be *received with great caution*— the evidence consisting, as it does, in the mere repetition of oral statements, is subject to much imperfection and mistake: the party himself either being misinformed, or not having clearly expressed his own meaning, or the witness having misunderstood him. It frequently happens also that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say."

We see no cause to disturb the decree below, and the judgment of the Appellate Court will, therefore, be affirmed.

*Judgment affirmed.*