MILTON ROGERS ET AL., PLAINTIFFS IN ERROR, V. HERBERT THURSTON, DEFENDANT IN ERROR.

1. **Sale:** DECLARATIONS OF VENDER: EVIDENCE. Declarations· of a seller of goods, made after the sale and delivery of such goods, and entirely disconnected with the transaction, are not· admissible in evidence against the purchaser.

2. ———: ———. Declarations of a person engaged in the mer-· cantile business as to the amount of an inventory of his assets, such declaration being made to a stranger about two weeks be-· ·fore the sale of his stock, are not admissible in evidence against the purchaser, who had no notice of the same, to prove the value of the goods, for the purpose of showing that the trans-· action was fraudulent.

ERROR to the district court for Valley county. Tried˙ below before TIFFANY, J.

*Thurston & Hall* and *A. M. Robbins,* for plaintiff in· error.

*Charles E. Magoon*, for defendant in error.

MAXWELL, J.

In February, 1883, one T. M. Ellis was engaged in the hardware business at Ord, in Valley county. At that time he was indebted to Milton Rogers & Son, in the sum of $960, and to Lee, Fried & Co. an amount somewhat exceeding $1,300. At that time the attorney of the creditors called upon Mr. Ellis for payment of said claims, and he being unable to pay, said attorney purchased the stock of goods from Ellis for said creditors, and took possession of the store, excluding Ellis therefrom. A few days afterwards, one Fred L. Harris caused an execution to be levied on the goods on a judgment in his favor against Ellis. Milton Rogers & Son and Lee, Fried & Co. thereupon brought an action of replevin, and regained the possession of the goods from Thurston, the sheriff. On the trial of the cause the jury returned a verdict in favor of defendant for the sum of $450, upon which judgment was rendered.

A large number of errors are assigned in the record, but two of which it will be necessary to notice.

Mr. Harris was called as a witness in his own behalf, and testified as follows:

Q. You are acquainted with one Lew Ellis, that was engaged in business here in the year '83?

A. Yes, sir.

Q. State if you saw him, shortly after returning from Omaha, in the early part of '83?

A. Yes, sir.

Q. When was that?

A. That was about the 21st or 22d day of February, '83.

Q. State if you had any conversation with Mr. Ellis?

A. I had a conversation with Mr. Ellis.

Q. You may state whether or not it was respecting the goods in controversy?

A. I had a conversation after I came back from Omaha, with Mr. Ellis; it was about the 21st or 22d of February, '83, I was in the bank ; I had been away.

Q. You may state what that conversation was?

A. I had been away, I came home, went into the bank, was around transacting some business ; Mr. Ellis came in, he came around behind the railing of the bank; I says, "You have been doing some business since I have been gone;" he says, "Yes;" I says, "What did you do it for?" He says, "I didn't understand what I was doing at the time I did do it."

Q. Go ahead and state the conversation as it occurred, specifying the time it occurred, respecting the sale here in question?

A. He says, "They rushed in on me, and said I was busted, and wasn't worth anything, and that they had to do something." He said, "They fetched out some papers, I really didn't understand what they was." I says, "What did you sign them for? Didn't you know it was taking my rights away from me." He says, "No, I didn't so understand it;" he says, "I asked them particularly about you."

A. I asked him why he did it. He says, "I understood that I was to stay in there."

Q. What does it refer to?

A. The sale of this property.

Q. The sale of this property to whom?

A. To Lee, Fried & Co. and Milton Rogers & Son. I asked him why he did it; he says, "I did not understand really what it was doing." He says, "They came up there."

Q. State the balance of the conversation?

A. He says, "They told me that I was to stay in there and sell the goods and pay your debts;" he says, "That

was the only reason I sold out for;" he says, " They represented to me that I was to stay in that house and sell those goods and pay you," that's me. He says, " That is the only reason I made this transaction, signed those papers."

A. Ellis told me distinctly that he asked them about me, and that they told him that my claim was to be paid in full; that he was to stay in there, sell the goods, and pay me out of the proceeds; I asked him " What did you go away so quick for, seems to me you are hurrying away pretty fast." He said, "I supposed I was to stay in there and sell those goods and pay you."

Q. Mr. Ellis said he was to stay in there and sell those goods?

A. Mr. Ellis, after this conversation, says that he went back there to take possession of this stock.

Q. What, if anything, occurred after the papers were signed?

A. He started to get possession of the stock and he was told by Lee.

Q. Was you present when he was told?

A. That is what Ellis told me. He told me he was starting back to take possession of the stock. He said they told him he wasn't needed there any more.

Q. Whom did he refer to by the word they?

A. Lee, Fried & Co.

Q. What did they say?

A. They said he wasn't needed around there; he said his signs were torn down and he had no other place to go; he said he never thought—

Q. Never mind that. What was said, if anything, respecting employment by Lee, Fried & Co.?

A. He said Lee, Fried & Co. offered him a job; his store was taken away, signs torn down, and he might as well go back.

Q. Do you know where this man Ellis is now?

A.  I do not.

Q.  Do you know where he has been at any time since this, and in whose employment he has been since this sale?

A.  He wrote me about—

In his cross-examination and redirect examination, Mr. Harris states more definitely what was stated by Ellis, in relation to the sale of the goods.

There is a very large amount of testimony of different witnesses, detailing the admissions of Ellis after he had sold the goods to the plaintiffs.  All such testimony was objected to by the plaintiffs, and admitted over their objection, exceptions being duly taken.  There is no charge of conspiracy between the plaintiffs and Ellis to defraud the other creditors of Ellis, and even if there were, the common design must be first shown before the statements or declarations made by one of them in the absence of the others can be given in evidence against the others.  *People v. Parish,* 4 Denio, 153.  *Williamson v. Commonwealth,* 4 Gratt., 547.  *State v. Simmons,* 4 Strobh., 266.  *Regina v. Mears,* 1 Eng. Law Eq., 581.  *State v. Ripply,* 31 Me., 386.  *Glory v. State,* 13 Ark., 236.  But there was no attempt to prove conspiracy.

2.  We know of no rule that would justify the proof of the admissions of Ellis against the plaintiffs, made after he had parted with his title to the goods to the plaintiffs. Evidence of oral admissions in any case is to be received with great caution.  While the statements of a person prejudicial to his own interest are admissible in evidence against him, yet the repetition of oral statements is always subject to great imperfections.  The party making the admission may not have correctly expressed his meaning, or he may have spoken jestingly, or without due consideration; and even if his meaning was correctly expressed, he may have been misunderstood, or a slight alteration of the words, without any design to misrepresent, may entirely vary the effect of the statement, hence courts, while hold-

ing that such evidence is admissible in a proper' case, receive it with great caution. 1 Phil. Ev. (4th Ed.), 479, and notes. Judge Redfield, in the 12th Ed. of Greenleaf on Evidence, Vol. 1, Sec. 200, in speaking of proof of oral admission, says: "In a somewhat extended experience of jury trials, we have been compelled to the conclusion that the most unreliable of all evidence is that of the oral admissions of the parties, and especially where they purport to have been made during the pendency of the action, or after the parties were in a state of controversy. It is not uncommon for different witnesses of the same conversation to give precisely opposite accounts of it; and in instances it will appear that the witness deposes to the statements of one party as coming from the other, and it is not very uncommon to find witnesses of the best intentions repeating the declarations of the party in his own favor as the fullest admissions of the utter falsity of his claim. When we reflect upon the inaccuracy of many witnesses, in their original comprehension of a conversation, their extreme liability to mingle subsequent facts and occurrences with the original transactions, and the impossibility of recollecting the precise terms used by the party, or of translating them by exact equivalents, we must conclude there is no substantial reliance upon this class of testimony. The fact, too, that in the final trial of open questions of fact, both sides are largely supported by evidence of this character, in the majority of instances, must lead all cautious triers of fact greatly to distrust its reliability." But in no case can admissions made by a vendor after he has parted with his title, and not connected with the transaction, be admissible against his vendee. This precise question was before this court in *Simpson v. Armstrong*, 20 Neb., 513, where it is said: "The only theory upon which testimony of this kind is admissible is, that it becomes a part of the *res gestœ*, being so nearly connected therewith as to be spontaneous and unpremeditated, and therefore

free from sinister motives, thus giving a reliable explanation of the principal transaction—the subject of the inquiry." This testimony, therefore, was not admissible, and is clearly shown to have been prejudicial to the plaintiffs.

3. Mr. Harris was permitted to testify that Ellis made an inventory of his stock about ten days or two weeks before the sale to the plaintiffs, and that he had informed the witness that the sum total of his (Ellis's) assets was about $3,000, or $3,100. This testimony was introduced for the purpose of proving the value of the property which the plaintiffs received from Ellis, and was clearly prejudicial.

There are other errors alleged, but as there must be a new trial, and it is probable the errors complained of will be avoided, they need not be further considered. The judgment of the district court is reversed, and the cause remanded for further proceedings.

REVERSED AND REMANDED.

THE other judges concur.