## NIC. MARZEN

### v.

### THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed April 21, 1898.*

1. CRIMINAL LAW—*court should not express opinions on questions of fact.* The remark, "I believe that is the same can," made by the judge in the presence of the jury during the examination of a witness called by the People to identify an oil can as the property of the defendant, in order to connect him with an attempt to burn the body of the deceased with whose murder he was charged, is improper, being an expression of opinion on a controverted question of fact, calculated to unduly influence the jury.

2. SAME—*witnesses called to identify exhibits should be left free to state the facts.* Where the identification of an exhibit is an important circumstance in a criminal case, witnesses called for the purpose of identification should be left free to state the facts, without being influenced by any suggestive questions put by the court.

3. SAME—*malice aforethought does not imply a considerable lapse of time.* An instruction in a murder trial which assumes that deliberation means the lapse of considerable time between the malicious intent to take life and the execution of that intent is erroneous, as, while the deliberate intent to kill may not have been formed for any specific length of time, it must exist at the moment of the killing to constitute malice aforethought.

4. EVIDENCE—*verbal admissions of accused should be acted upon with great caution.* Statements of witnesses as to verbal admissions of the accused should be received by the jury with great caution, as such evidence is subject to imperfection and mistake, and it is only when such admissions are deliberately made and precisely identified that the evidence afforded thereby is satisfactory.

5. SAME—*circumstantial evidence must exclude every reasonable hypothesis of defendant's innocence.* Circumstantial evidence, to warrant a conviction, should be of a conclusive nature, leading, on the whole, to a satisfactory conclusion, and producing, in effect, a moral certainty that the accused, and no one else, committed the crime, and must be such that the circumstances proven cannot, upon any reasonable theory, be true and the defendant be innocent.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. ABNER SMITH, Judge, presiding.

WILLIAM VOCKE, JOHN J. HEALY, and JAMES P. HARROLD, for plaintiff in error.

E. C. Akin, Attorney General, (D. C. Hagle, and C. A. Hill, of counsel,) for the People.

Per Curiam: This is an indictment against the plaintiff in error for the murder of one Fritz Holzhueter. Plaintiff in error was found guilty by the court below and sentenced to be executed on May 15, 1896, but a *supersedeas* was granted and the execution stayed.

The deceased, Fritz Holzhueter, was seen for the last time between six and seven o'clock on the morning of January 30, 1895, at the saloon of the plaintiff in error, at 3517 South Halsted street, in Chicago. On Monday morning, February 25, 1895, about nine o'clock, his body was found by two boys, named Joseph Zeeder and William Fleming, aged, respectively, sixteen and eighteen years. These boys were at that time driving on Western avenue, from Ninety-fifth to Ninety-third street, and while so driving discovered the body of an unknown man lying five or six feet west from the road, under a large willow tree. The mother of the boy Zeeder lived on Western avenue, north of Ninety-third street. On the Monday morning in question the boys had driven to a school house about a mile and a half south of the Zeeder home to take young Zeeder's sister to school. It was on the way back, and after leaving the girl at school, that they discovered the body under the tree. They at once reported their discovery to one Foley, the president of Evergreen Park. The body was that of a stout man, with hair of sandy color. The man wore a blue flannel shirt, which was burned, and a red flannel shirt inside, which was also burned around the side and breast. The man had on pants and vest, and his face and legs, as well as his clothes, were burned. There was a smell of kerosene oil about him. The top of his head was cut and there was blood in his hair. The body was lying over the root of the tree, the hips reclining on the root. The tree was large and thick. The deceased was lying

on his back, with his face up. The body was burned very much in front, mostly on the left side,—in some places on the skin, in others clear through into the flesh. At three places on the left side the flesh was eaten in to the bone, apparently by animals, probably dogs. It was the body of a young man weighing about 180 pounds. The coroner's physician, who examined the body on February 27, 1895, at the county morgue, testified that the burns were not more than two or three days old, and that in his opinion the man had been dead for some time,—more than two weeks at least. The head showed three scalp wounds, one on the right side above the ear, the other over the left eye, and the third on the back of the head. The wounds on the back of the head were caused by a blunt instrument, while that in front would appear to have been caused by something with a sharper edge than the instrument which inflicted the other wounds. The death was caused by shock and hemorrhage, resulting from these fractures in the skull. The testimony shows that the body thus found was the body of the deceased, Fritz Holzhueter. It was identified by his sister and by his business partner.

The theory of the prosecution is, that the deceased was killed by the plaintiff in error on the morning of January 30, 1895, and that his body was concealed in the barn of plaintiff in error until the night of Saturday, February 23, 1895, and was on that night taken by the plaintiff in error in his wagon to the place where it was found on the following Monday morning. There is no direct and positive evidence that the deceased was murdered by the plaintiff in error. The testimony tending to establish the guilt of the plaintiff in error is altogether circumstantial in its character. The facts and circumstances relied upon to establish the guilt of the plaintiff in error are substantially as follows:

The deceased, Holzhueter, at the time of his death, was in partnership with one Otto Retzlaff. They formed

a partnership on October 23, 1894, and at the time of
Holzhueter's death had a saloon and market at the south-
east corner of Thirty-eighth and Honore streets. Retzlaff
tended the saloon and Holzhueter the market.    Their
saloon and market was about eight and one-half miles
distant from the corner of Western avenue and Ninety-
fifth street, where the body was found. The saloon of the
plaintiff in error, which was on Halsted street a few doors
from Thirty-fifth street, is about ten miles from the place
where the body was found.   The plaintiff in error and
Holzhueter were acquainted and appeared to be friends.
They were talking together in Retzlaff's saloon on Sat-
urday, January 26, 1895, and on Sunday, January 27, 1895,
and on Monday, January 28, 1895. They were also together
at the same place on the afternoon of Tuesday, January
29, 1895.   Some arrangement was made between them at
that time, by which, on the next morning, January 30,
they were to go into the country to the farm of a man
named Fisher, who lived at Manhattan Park, for the pur-
pose of buying some cattle from him.   Retzlaff testifies
that Marzen parted with Holzhueter at his place after
four o'clock on Tuesday, January 29, and that he heard
him say, "Now, Fritz, don't be late to-morrow morning."
The deceased did go the next morning from his place at
the corner of Thirty-eighth and Honore streets to the
saloon of the plaintiff in error, Marzen.  He was in Mar-
zen's saloon as early as a quarter to six on the morning
of January 30, 1895.   The testimony shows that while
Holzhueter and Marzen were in the saloon that morning
the following persons were also there:   Joseph Wetzler,
a meat peddler, August Buchal, a tenant of Marzen, who,
with his son, occupied a few rooms above the saloon, and
Charles Rust, a watchman. During the morning two team-
sters came in. Wetzler says that when he came in Marzen
was behind the bar and Holzhueter was sitting in front
of the stove, facing the bar.   Marzen and Wetzler were
treated by Holzhueter to liquor.  Wetzler then had some

conversation with Holzhueter, in which the latter told him that he wanted to buy some cows. Wetzler says that he told Holzhueter that he had seen a cow at the corner of Emerald avenue and Thirty-sixth street which was for sale. Holzhueter then replied that he thought he would go and buy the cow referred to by Wetzler. Wetzler also says that at the same time Holzhueter showed him "a big leather bag with leather strings on it, with paper money and silver in it." He also says that the two teamsters came in after that and Holzhueter treated all to whisky; that the teamsters then went out and Rust came in. Wetzler left at about six o'clock. Buchal came in about five minutes before six, and speaks of seeing Wetzler, Holzhueter, Rust, Marzen and the two teamsters there. After Wetzler and the two teamsters left, Buchal, Rust, Marzen and Holzhueter were in the saloon. Buchal says that Marzen and Holzhueter had another drink together and then went out of the back door. Marzen said to Buchal, "Gus, stay here till I come back." Rust also says that he proposed to go home, but Marzen asked him to stay a while till they should come back, and said that they were going over to Thirty-sixth street and Emerald avenue to see a cow that Wetzler had told them about. Marzen and Holzhueter then went out through the back door of the saloon that leads into the kitchen. In about ten or fifteen minutes Marzen came back again through the same door alone. When he came back both Buchal and Rust were in the saloon. They both agree in the statement that Marzen was not gone from the saloon more than ten or fifteen minutes, and that he re-entered the saloon by the back door. When he came back he had a brown woolen jacket on and a plush cap, and an over-coat on his arm. He had his left hand in his pocket, and with his right hand he opened the door and shut it again.

The building in which Marzen had his saloon is a two-story brick store and flat, five or six doors south of Thirty-fifth street, upon the east side of the street. Over

the saloon were rooms in which, as we understand the evidence, Marzen and his family lived, and one or two of which rooms were also occupied by Buchal. In the rear of the saloon was a yard, and in the yard was a wood-shed and a barn. There was a large door in the barn, which was entered from the yard., In the large door was also a smaller door, which could be entered without open-ing the larger door. There was also a door leading into the alley in the rear of the barn. There seems to have been a narrow passageway between Marzen's house and the house next to his, which passageway was enclosed by fences on either side. The evidence tends to show that this passageway could be easily entered by jumping over the fence from the platform in the rear of Marzen's house. Buchal's room up-stairs was in the rear, and over the kitchen and dining room, and he entered the saloon that morning in front, through the side door, from up-stairs.

When Marzen re-entered the saloon without Holz-hueter, Rust asked him where Holzhueter was. Marzen then stated that he and Holzhueter went up to Thirty-sixth street with a view of seeing about the cow which was for sale, but that when they arrived there Holzhueter met a friend, who was an ice-man and wanted to buy Holz-hueter's ice-wagon; that they had some talk about the price of the wagon, the ice-man offering $50 and Holz-hueter wanting $75; that Holzhueter asked the ice-man into a saloon to take a drink and asked Marzen to drink with them, but that he, Marzen, said to them that if they wanted to get a drink they should come down to his saloon; that they, however, went in there to get a drink, and he, Marzen, came back; that he left Holzhueter at the corner of Thirty-sixth and Halsted streets, and that he was talking with a slim man with a black mustache. The account thus given by Marzen as to where he went that morning with Holzhueter, and as to where he left the latter, is testified to by both Buchal and Rust. After this statement by Marzen, Rust remained but a short time

and left the saloon.   Marzen, however, before he left, or
as he was leaving, requested him to stop at a feed store
which he was obliged to pass, and order for him half a
ton of coal, a bale of straw and a bushel of bran, to be
sent at once.   This order was given by Rust at the feed
store.   The reason given by Marzen for wanting the stuff
ordered immediately was that he intended to go with
Holzhueter to the Northwestern depot.   It was about
thirty minutes to eight o'clock when Rust left.   Buchal
says that he soon went up-stairs and then went down to
the saloon again about eight o'clock.   He says that Mar-
zen had rolled a barrel of beer out of the front door and
came back again, and stated that Holzhueter and an Irish-
man had just passed, and that Holzhueter went down to
Thirty-fifth street and said he would come right back
again and take the nine o'clock train.   Buchal says that
he stayed till about nine o'clock, but had no further
conversation with Marzen with reference to Holzhueter.
Holzhueter, the deceased, has never been seen since he
went out of the back door of the saloon with Marzen
about six o'clock on the morning of January 30, 1895, un-
less he was seen by Marzen, if Marzen's statement is true
that Holzhueter passed along the street with an Irishman
about eight o'clock.

It is claimed by the prosecution that when Marzen left
the saloon by the back door in company with Holzhueter,
he and Holzhueter passed into the barn, and that while
they were in the barn Marzen struck Holzhueter over the
head with a cleaver, which is proven to have been after-
wards found in the barn, and thereby inflicted upon him
the wounds which proved to be mortal.

The prosecution rely upon a variety of circumstances
shown in the testimony for the purpose of proving that
the body of Holzhueter was concealed in the barn from
the 30th of January to the 23d of February.   Testimony
was introduced tending to show that before January 30
the door of the barn was left open, and was entered by
173—4

Buchal and his son for the purpose of taking coal into the barn and getting coal out of the barn, but that after January 30, 1895, the door of the barn was kept locked and that Marzen kept the key thereto behind the counter. The testimony tends to show that when Buchal or his son had occasion to go to the barn they asked Marzen for the key, and that Marzen generally went with them, taking a bucket of water for the horse which was in the barn. There is also some evidence to the effect that there was not such strictness in keeping the barn locked after January 30 as is insisted upon by the prosecution. One of the witnesses says that when Marzen was asked why he kept the door locked, he replied that the boys (Buchal's son and his sons) were in the habit of playing in the barn, and he locked the door for the purpose of keeping them out. Witnesses for the State testify that after the arrest of Marzen they examined the barn, and found upon the floor, and upon some of the boards in the side of the barn, blood and human hair, and that there was blood upon a tarpaulin which was found in the barn. The testimony seems to be conclusive that there was blood of some kind found in the barn, but the expert witnesses are not able to testify positively that the blood was human blood. They do speak more positively as to the existence of hair which was human. The defense claim that Marzen not only kept a saloon, but was a butcher and dealt in cattle, and that the spots of blood which were found were made by the blood of cattle. One or two witnesses testify to seeing a calf at one time upon the table in Marzen's saloon, but there is no evidence showing that any butchering of any calf or other animal took place in the barn.

When the body of Holzhueter was examined some bran was found in his whiskers and hair. Upon his overcoat, which was discovered in the manner hereinafter stated, there were found certain marks or stains, made by coal or coal dust. These circumstances are referred

to as indicating that the body had been in the barn, because coal and straw and bran were kept in the barn. It also appears that Marzen hauled in his wagon on the afternoon of Saturday, February 23, 1895, some coal screenings. Near the body was found a piece or pieces of charred rope. Some pieces of rope were also found in the barn, and there is testimony tending to show such a correspondence between the rope found near the body and the rope found in the barn as to indicate that they were parts of the same rope. The fact that the body was not more decomposed than it was at the time of its discovery is attributed to the fact that the weather between January 30 and February 23 was quite cold, and testimony was introduced showing the temperature of the weather at various times between these dates.

The motive assigned for the murder charged against the plaintiff in error is the desire to get possession of the money which Holzhueter had. Retzlaff, the partner of Holzhueter, testifies that on Monday, January 28, 1895, he gave to Holzhueter $210, in $10, $5 and $20 bills, and that Holzhueter also had other money, amounting to about $40, at that time, making $250 in all; that he put some of these bills in his vest pocket, and at the same time had a pocket-book six or eight inches long. There is testimony on the part of the State tending to show Marzen had but little money before January 30 and that he exhibited a considerable amount of money shortly afterwards, and on that day and subsequent days made quite a number of purchases of clothing and crockery and other articles. There is also some proof on the part of the defense tending to show that before January 30 he had money, as indicated by his payment of certain bills prior to that date.

The prosecution claim that they have proved such circumstances as lead to the conclusion that Marzen carried the body on the night of February 23 to the place where it was found. A man by the name of Trager, a gardener, testified that he worked in February for one

Healy in a hot-house, on the corner of Seventy-ninth place and Hoyne avenue; that on the night of Saturday, February 23, 1895, he left the hot-house about ten minutes of eight and went for his horse and wagon, and drove out on Seventy-ninth place to Hoyne avenue, and north on Hoyne avenue to Seventy-ninth street, and east on Seventy-ninth street to Ashland avenue; that it was a light night, and that on Seventy-ninth street, one hundred and twenty-five feet west of Robey street, he was hailed by a man in a wagon about ten feet away, going west; that the person in the wagon asked him whether he knew any one around there by the name of Jacob Brown; that Jacob Brown had told him that he had three fat cows for sale, and lived three blocks east of Western avenue on Seventy-ninth street; that the man spoke with a broken, foreign accent; that he, the witness, replied that three blocks east of Western avenue there were only cabbage patches, and no houses or streets; that the man cursed and offered him a drink, and that witness got out and went to his wagon and placed his foot on the hub; that he asked him if he was a German, and, upon finding out that he was a German, they carried on their conversation in German. This witness testifies that he saw a name upon the wagon, and that the name was "Nic. Marzen." After the arrest of Marzen, Trager was requested by several policemen at the station to stand outside of a room in which Marzen and some others were talking, and he says that he recognized Marzen's voice as the voice of the man whom he had seen on the Saturday night referred to. Trager did not see the face of Marzen, and he was not able to say that Marzen was the same man whom he had seen, otherwise than by the sound of his voice. Marzen did not testify in this case, but the witness Trager states that when he appeared before Marzen in the presence of the policemen, Marzen denied that he had ever seen him before, and also denied that he was at the place named on Saturday night. He says, however, that

Marzen admitted that he was a few blocks west of Halsted street looking for some calves which he had been told were for sale, but that he was not south of Sixtythird street.   Trager also says that the man whom he saw was wrapped up.   He also says that he saw something in Marzen's wagon when he put his foot on the hub of the wheel.   Upon his direct examination he said that he saw a horse blanket, or quilt, or tarpaulin.   Upon his cross-examination he said that it was a bundle of cloth of some kind, but that he was unable to give any other description.   He said that the bundle reached clear across the whole wagon as far as he could see, but that he did not look under the seat.

The boys Fleming and Zeeder slept on Saturday night at Mrs. Zeeder's house on Western avenue, near Ninetythird street.   They went to bed about eight o'clock and were awakened in the night by the barking of the dogs, and heard something going along the street like a buggy or wagon, and young Zeeder testified that the dogs ran up towards Ninety-fifth street, barking.

After the arrest of plaintiff in error the police examined the barn and the wagon in the barn.   Spots of blood were found in the wagon, and also near the seat of the wagon was found a spot or stain made by kerosene oil.   Two of the policemen then went to the neighborhood where the body was found, for the purpose of searching for the oil can.   One of the policemen walked along from the place where the body was found to Sixtyninth street, and when he came to Eighty-fourth street he found an oil can inside of the fence.   There was some oil in the can.   The can was handed to a policeman, who carried it at once to the station.   The finding of this can was confirmed by the testimony of two or three policemen.   It was a tin can with a wooden jacket or outside cover, holding about three gallons.   The testimony tends to show that the can thus found was the same can which had been used in Marzen's saloon for the purpose of fill-

ing the lamps with oil. The testimony of the party who sold the can to Marzen originally, and the testimony of parties who went to the grocery to get the can filled for Marzen and who used the can in filling Marzen's lamps, tends to show that the can which was found by the policemen was the same can which had been used by Marzen in his saloon, or very much like Marzen's can.

The testimony shows that on Saturday night before the body was found, one Feeley and quite a number of other men went out in a wagon to a saloon on Ninety-fifth street to see a dog-fight. Feeley swears that after twelve o'clock they were near Mrs. Zeeder's inn, upon Western avenue, when a fire on the west side of the road attracted their attention; that before he got to the fire he saw a man crossing in front of his horse from the east to the west side of Western avenue; that witness asked the man where Ninety-fifth street was, and the man told him to keep right on and he would find it; that the man spoke in broken English, and went over the fence, and the witness saw no more of him; that there were two or three men walking along, who jumped over the fence and tried to put out the fire; that on the way back the next morning the witness got to the tree about half-past five o'clock; that the man who crossed the road wore a cap with a peak. The testimony of four other men confirms what is said by Feeley upon the subject. One of these men, O'Hara, says that they got back to where the fire had been seen about five o'clock in the morning, and that he saw a pair of shoes and a pair of legs, but did not stop, as they were in a hurry. There is nothing, however, in the testimony of Feeley, or of any of the men with him, which in any way identifies Marzen, the plaintiff in error, as the man who was seen by them.

On Monday, February 25, one Lemerisse, a mail messenger and school janitor, found an overcoat under the sidewalk on the north side of the Burlington and Ohio railroad tracks on Seventy-ninth street, on the north

side of the street and west of the tracks, under the middle of the walk. It was a blue chinchilla overcoat, full of coal dust, and there was on it mud, and grain like the bran of wheat. In the pockets of the coat were found two handkerchiefs, a pair of gloves with blood spots on one of them, a flask, and a card having on it the names "Retzlaff & Holzhueter, Wine and Beer Saloon, 3801 Honore Street." The witness who found the overcoat testifies that he saw on it coal dust, and grain and straw and bran. The evidence tends to show that the overcoat thus found was the overcoat of the deceased, but there is no evidence connecting Marzen in any way with the location of the overcoat at the place where it was found.

Testimony was introduced on both sides with reference to the whereabouts of Marzen on Saturday night. Buchal testifies that he went into Marzen's saloon on Saturday night before his arrest, at about half-past ten o'clock, and found Marzen absent; that he saw Marzen in the saloon the next morning,—Sunday morning,— about six o'clock, and asked him at what time he got home the night before, and Marzen answered, "about eleven o'clock." On the other hand, Annie Hardwig, a servant girl in the family of Marzen, testified that Marzen was at home at eight o'clock and at half-past ten o'clock on Saturday evening.

Certain rulings of the court in the admission and exclusion of evidence, and the giving and refusal of instructions by the court, are assigned as error. These assignments of error must be considered in view of the fact that the evidence upon which the plaintiff in error was convicted is purely circumstantial.

*First*—One of the many circumstances relied upon by the State for the conviction of the plaintiff in error was the alleged fact that the oil can found by the policemen was the same can which had been used in Marzen's saloon. The witness August Buchal was examined upon this subject, and the following is a part of his examination:

Q. "You have looked at the can shown you?

A. "Yes, sir.

Q. "When was the first time; have you ever seen that can before?

A. "This is the way; I know it from the top.

Q. "Answer yes or no.   Have you ever seen that can before?

A. "No, sir; not seen it.

Q. "Have you ever seen that can before to-day?

A. "No, not before to-day.

Q. "When was the first time you saw that can—the first time when you ever saw that can?   When was it?

A. "That was the time I seen it when I filled the lamps, and now.

Mr. Pearson: "The can shown the witness is exhibit 43, oil can.

Q. "You don't know whether it is his can now, do you?

A. "Not except the leak, and that bend, and the way it looks to me.

The court: "What is your best judgment about that,— what is the best guess you can make about whose can it was?

Mr. Elliott: "I beg pardon, your honor; I shall object to making any guesses.

The court: "Perhaps you are right, too.   I would like to have him give us his best judgment about that.

Mr. Pearson: "I submit the word 'judgment' would be the proper word.

A. "I only can give that.   I know that can had a bend on top.

The court: "I believe that is the same can.

A. "Yes, sir; I believe it is, the way it looks on the top and the crack is in it, and if it leaks down at the bottom then I believe it is.

Mr. Elliott: "I object to the question and answer, and ask that they be stricken out.

The court: "I will let it stand.   It may be improper."

Both the counsel for plaintiff in error and the counsel for the People, in quoting the above extract from the testimony in their briefs, put into the mouth of the trial judge the words, "I believe that is the same can." It is objected that it was improper .for the court thus to express his belief that the can which was produced as an exhibit, and which was the can found by the policemen, was the same can that had been used in the saloon. In view of the circumstantial nature of the evidence we are inclined to the opinion that this remark, viewing it as an expression of opinion by the court, was improper. It was a question of fact, to be determined by the jury from all the circumstances, whether or not the can exhibited was the same can which had belonged to the plaintiff in error. Whatever belief was to be entertained upon this subject was a belief to be entertained by the jury. When the court made the statement thus quoted he invaded the province of the jury. The statement by the court that he believed the can found to be the same can which belonged to the plaintiff in error, was calculated to unduly influence the jury in the matter of determining a question of fact. In *Kennedy* v. *People*, 44 Ill. 283, the court excluded certain evidence, and, after reciting it, remarked in the presence of the jury "that it amounted to nothing." In regard to the statement thus made by the court in that case we used the following language (p. 286): "The court, in this, assumed the province of the jury in determining the weight of the evidence. It was for the jury, and not for the court, to say whether these statements, if made, amounted to anything, and such remarks made by the court in the hearing of the jury are well calculated to exclude from their consideration such evidence." In *Andreas* v. *Ketcham*, 77 Ill. 377, we said (p. 379): "We are aware of no rule of law or practice that would allow the presiding judge to give to the jury his opinion on a controverted question of fact. The knowledge of the judge on the question at issue may have been superior to that of any witness sworn,

yet the law would not permit him to bias the jury by his own opinion as to any fact in controversy which had to be established by evidence. * * * The opinion of the judge, given, as it was, before the jury upon a question of fact which was controverted, could not do otherwise than prejudice the jury against appellants. * * * In cases where the jury have the sole power to determine questions of fact from the evidence, the law cannot be properly administered and justice done parties in litigation if the judge presiding, after the evidence is closed, gives to the jury his own opinion on a question of fact." *Artz* v. *Robertson,* 50 Ill. App. 27.

Counsel for the State, in reply to the objections made to the statement of the court as above quoted, say that no objection or exception was taken to the remark of the court. We do not so understand the record. Counsel for the prisoner said, "I object to the question and answer, and ask that they be stricken out." The question here objected to was the remark of the court, which was evidently understood by the counsel for the prisoner to be interrogatory in its form; and, indeed, the original record shows an interrogation point after the words which were uttered by the court, to-wit, the words "I believe that is the same can." If it was a mere question put by the court to the witness, it may not have been understood by the jury as an expression of opinion by the court of the identity of the oil can. It seems that the witness regarded it as a question, for he answered, "Yes, sir; I believe it is, the way it looks," etc. Still, we think it was improper, and that it was a part of an improper examination made by the court, as above set out, all of which was objected to by counsel for the defendant at the time. The witness had not stated that he believed it was the same can until such an answer was suggested by the remark or question of the court. An ignorant man, as the witness appears to have been, would doubtless understand from an examination of so suggestive a

character conducted by the presiding judge, that he was expected to identify the can produced as the one belonging to Marzen, and which he had used when he lived in Marzen's house. The liability to be mistaken upon questions of identification is a matter of common knowledge. The identity of this can was an important circumstance in the case, and the witness should have been left free to state the facts, including the fact whether it was the same can or not, without the suggestive questions put by the court.

It is furthermore said by counsel for the People, that although Buchal's identification of the can exhibited to him was not in any way clear or positive, yet that the testimony of other witnesses was clear and positive as to its identity, and that, therefore, no harm was done to the accused. After a careful examination of the evidence of the other witnesses upon this subject we do not regard it as so clear and convincing as to satisfy us that no harm was done by the remark of the court.

*Second*—It is assigned as error that the court gave to the jury the third and twenty-second instructions which were given for the People. The third instruction given on behalf of the prosecution was as follows:

"The court instructs the jury, as a matter of law, that the words 'malice aforethought' do not necessarily imply deliberation, or the lapse of a considerable time between the malicious intent to take life and the actual execution of that intent. Whether the design to effect death is formed on the instant or had been previously entertained is immaterial, for the malicious killing, if proven from the evidence beyond a reasonable doubt, in either case is murder under the laws of the State."

We are inclined to regard this instruction as erroneous. We have said that "malice is always presumed when one person deliberately injures another. It is the deliberation with which the act is performed that gives it character. It is the opposite of an act performed in uncontrollable

passion, which prevents the deliberation or cool reflection in forming a purpose." (*Davison* v. *People*, 90 Ill. 221; *Spies* v. *People*, 122 id. 1.) It is true that it is not necessary that the party should have entertained the malicious intent for any considerable time, (*Weaver* v. *People*, 132 Ill. 536,) but it is none the less true that malice involves deliberation. The deliberate intent to kill may not have been formed for any specific length of time, but it must exist at the moment of killing. The instruction assumes that deliberation means the lapse of a considerable time between the malicious intent to take life and the actual execution of that intent. While there can be no doubt there had been a malicious killing of the deceased, yet the question whether such malicious killing was done by the plaintiff in error was a question of fact to be determined by the jury, and it was important that they should be correctly instructed.

The twenty-second instruction given by the court on behalf of the prosecution was as follows:

"The court instructs the jury, as a matter of law, that if you believe, from the evidence in this case, beyond a reasonable doubt, that any voluntary admissions or declarations were made by the defendant upon matters material to the issue in this case prior to and after his arrest, then it is the duty of the jury to consider such declarations or admissions precisely as any other testimony, and hence if the jury believe all of the admissions and declarations to be true, they will act upon the whole as true. But the jury may believe that which charges the prisoner and reject that which is in his favor, if they see sufficient grounds in the evidence or any inherent improbability in the statement itself. The jury are at liberty to judge of it like any other evidence, by all of the circumstances in the case."

There was very little, if any, evidence introduced proving any admissions of any kind made by the plaintiff in error. There was here no free and voluntary confes-

sion of guilt, which is regarded as evidence of the highest order. (*Langdon* v. *People*, 133 Ill. 382; *Lyons* v. *People*, 137 id. 602.) The instruction may well be treated as erroneous because it is not based upon the evidence. But if it be not incorrect for this reason, it is too broad in its language and omits necessary and proper qualifications, as hereinafter indicated. As in the present case the plaintiff in error did not testify as a witness, the proof of his verbal admissions consisted of statements made by other witnesses as to such verbal admissions. As a general rule, the statements of a witness as to verbal admissions of a party should be received by the jury with great caution, as that kind of evidence is subject to imperfection and mistake. Greenleaf, in his work on Evidence, says, at section 200: "With respect to all verbal admissions it may be observed that they ought to be received with great caution." (*Allen* v. *Kirk*, 81 Iowa, 670; *Kelsoe* v. *State*, 47 Ala. 599; *Cousins* v. *Jackson*, 52 id. 264; *Rogers* v. *Thornton*, 24 Neb. 331; *Bragg* v. *Geddes*, 93 Ill. 39; *Schwachtgen* v. *Schwachtgen*, 65 Ill. App. 127.) Where the admissions are deliberately made and precisely identified, the evidence afforded by them is of a satisfactory character. The instruction, however, does not contain this qualification. The instruction leaves it to the jury to receive and act upon such admissions whether they do so with caution or not, and without reference to the question whether such admissions were deliberately made or not. *Allen* v. *Kirk, supra;* 1 Greenleaf on Evidence, sec. 200.

*Third*—We think the court erred in refusing to give the nineteenth instruction asked by the plaintiff in error. That instruction is as follows:

"The court instructs the jury, that in order to warrant a conviction for crime on circumstantial evidence, the circumstances, taken together, should be of a conclusive nature and tendency, leading, on the whole, to a satisfactory conclusion, and producing, in effect, a reasonable and moral certainty that the accused, and no one else,

committed the offense charged; and it is the invariable rule of law that, to warrant a conviction upon circumstantial evidence alone, such facts and circumstances must be shown as are consistent with the guilt of the party charged, and as cannot, upon any reasonable theory, be true and the party charged be innocent; and in this case, if all the facts and circumstances relied upon by the People to secure a conviction can be reasonably accounted for upon any theory consistent with the innocence of the defendant, then the jury should acquit the defendant."

This instruction conforms almost literally to the law as laid down by this court in *Dunn* v. *People*, 158 Ill. 586, and *Carlton* v. *People*, 150 id. 181. We see no reason why it should not have been given. It is true that the instructions given for the State told the jury that it mattered not that the evidence was circumstantial or made up from facts and circumstances, provided they believed that such facts and circumstances pointing to the defendant's guilt had been proven, so that there was no reasonable doubt in their minds as to the guilt of the defendant from all the evidence. But such instructions so given for the State did not define the nature and character of the circumstances to be relied upon for the purpose of showing guilt, with as much fullness and particularity as did the refused instruction No. 19. In *Purdy* v. *People*, 140 Ill. 46, we said, that where the criminating evidence is all circumstantial a conviction cannot be had unless the guilt of the accused is so satisfactorily established as to exclude every other reasonable hypothesis.

For the errors thus indicated the judgment of the Criminal Court of Cook county is reversed, and the cause is remanded to that court for further proceedings in accordance with the views herein expressed.

*Reversed and remanded.*