THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JESSE LUCAS, Plaintiff in Error.

*Opinion filed April 21, 1910.*

1. INDICTMENT—*when indictment of a principal and accessory before the fact is not improper.* A count charging one defendant with murder and in a separate paragraph charging the other defendant as an accessory before the fact is not improper, where the facts charged against the accessory, if proven, make her guilty as a principal, and the count concludes by charging both defendants as principals in the commission of the crime.

2. CRIMINAL LAW—*court is not bound to give instructions of its own motion.* The rule that it is not the duty of the court to prepare and give instructions of its own motion, even though the parties are entitled to have such instructions given if presented by them, applies to criminal cases as well as civil suits.

3. SAME—*a party cannot complain that court did not give instructions not requested.* Failure of the court, in a murder trial, to limit, by instruction, the effect of admissions by one defendant to such defendant and to instruct the jury in regard to the offense of manslaughter, cannot be complained of where no such instructions were requested by the defendants.

4. SAME—*the People are not required to establish guilt beyond the possibility of doubt.* The People are not required to establish guilt in a criminal case beyond the possibility of a doubt, and a clause in an instruction upon the subject of reasonable doubt which states that "it may be possible that the defendant is innocent and yet at the same time there may be no reasonable doubt but that he is guilty" is not erroneous.

5. SAME—*when instruction upon subject of malice is not erroneous.* An instruction stating that "malice is not confined to ill-will toward an individual but is intended to denote an action following from any wicked and corrupt motive,—a thing done with a wicked mind,—where the fact has been attended with such circumstances as evince plain indications of a heart regardless of social duties and fatally bent on mischief; hence malice is implied from any deliberate and cruel act against another, however sudden, which shows an abandoned and malignant heart," is not erroneous. (*Marzen v. People*, 173 Ill. 43, distinguished.)

WRIT OF ERROR to the Circuit Court of Wabash county; the Hon. P. A. PEARCE, Judge, presiding.

JAMES S. PRITCHETT, HOWARD P. FRENCH, and GREENE & RISLEY, (CLARK VARNUM, of counsel,) for plaintiff in error.

W. H. STEAD, Attorney General, H. M. PHIPPS, State's Attorney, and JUNE C. SMITH, for the People.

Mr. JUSTICE VICKERS delivered the opinion of the court:

Jesse Lucas and his mother, Margaret Lucas, were jointly indicted by the grand jury of Wabash county for the murder of Clyde Showalter. They were tried at the April term of the circuit court of said county and found guilty by the jury of murder as charged in the indictment, and their punishment was fixed at imprisonment for the term of their natural lives. A motion for a new trial was sustained as to Margaret Lucas but was overruled as to Jesse Lucas. As to him, the court entered a judgment of guilty and sentenced him to imprisonment for the term of his natural life, in accordance with the verdict of the jury. By this writ of error Jesse Lucas brings the record to this court for review.

The indictment contains three counts. The first count charges that Jesse Lucas, on the 19th day of October, in the year of our Lord 1905, at and within the county of Wabash, unlawfully, willfully, feloniously and of his malice aforethought made an assault upon Clyde Showalter with a certain stick and then and there inflicted a certain mortal wound upon some part of the body of said Clyde Showalter, a more particular description of said mortal wound, and the location thereof, being to the grand jurors unknown, and alleges that the said Clyde Showalter then and there of said mortal wound instantly died. The indictment then proceeds to allege that Margaret Lucas, not being then and there present at the time of the infliction of said mortal wound by Jesse Lucas in the manner described, had before that time unlawfully, willfully, feloniously and of her

malice aforethought advised, encouraged, aided and abetted the said Jesse Lucas in the infliction of the said mortal wound upon the deceased, and concludes by charging that the said Jesse Lucas and Margaret Lucas him, the said Clyde Showalter, in manner and form aforesaid, then and there unlawfully, willfully, feloniously and of their malice aforethought did kill and murder, contrary to the form of the statute and against the peace and dignity of the State of Illinois.  The second count is similar to the first, except that it charges the killing by Jesse Lucas in the same manner and by the same means described by the first count, and alleges that Margaret Lucas, then and there being present, unlawfully, willfully, feloniously and of her malice aforethought then and there aided, abetted and assisted the said Jesse Lucas in inflicting the said mortal wound, and concludes by charging both of the defendants with the crime of murder.  The third count charges both the defendants, jointly, with the infliction of the mortal wound, and is in all respects the usual and formal count for murder.  A motion to quash the indictment, and each count thereof, was made by each of the defendants and overruled.

The evidence is conflicting on behalf of the defendant in error.  The testimony tends to establish the following facts:  The deceased was a young man whose home was in Wabash county, not a great distance from the city of Mt. Carmel.  On November 19, 1905, the deceased was in the city of Mt. Carmel.  The evidence shows that he was more or less intoxicated.  He was seen frequently during the afternoon and evening of that day.  He never was seen alive after that evening.  Mt. Carmel is a city of five or six thousand population, located on the western bank of the Wabash river, the river at that point being the dividing line between Indiana and Illinois.  Patoka creek is a small tributary stream of the Wabash, and flows from east to west in the State of Indiana and empties into the Wabash a little south of the city of Mt. Carmel.  In the latter

part of May, 1906, something over six months after the mysterious disappearance of Showalter, two men, Melvin Gabbert and Albert Chapman, were looking for shells in Patoka creek about three-quarters of a mile above its mouth when they discovered something in the water, which, upon investigation, proved to be the body of a man in a very advanced state of decomposition. Other persons were notified and the body was taken out of the water. The clothing was on the body, with the exception that there were no shoes on the feet and no hat on the head. The body was partially buried in the sand and was bent over, with the head down-stream and the arms outstretched. A pocketbook was found on the body, containing some lodge receipts made out to Clyde Showalter from the Modern Woodmen of America. The body was so decomposed and the fleshy tissue sloughed off that it was beyond recognition. Subsequently the father of the deceased and others dragged the creek near where the body was found and recovered a watch which is identified as being the one the deceased was carrying when last seen. Plaintiff in error does not contend that the body found in Patoka creek was not the body of Clyde Showalter. The coroner of Gibson county, Indiana, made a pretense of holding an inquest to inquire into the cause and means by which the body came to its death, but his investigation failed to throw any light upon the subject.

The mother of plaintiff in error owned two houses in the city of Mt. Carmel, located in that part of the city known as "The Commons," both of which fronted on Cherry street. These houses are known in the record as the "old house" and the "new house." The old house is south and a little east of the new house. The south-east corner of the new house is about twenty feet north of the center line of the old house, north and south. In other words, the new house sets back from Cherry street several feet further than the old house, and the new house extends

much further west than the old house. The new house has a front entrance on Cherry street. It also has a porch and an entrance on the south side, which is north and west from the west end of the old house. West of the old house and south of the new house is an open lot or space about seventy-five feet north and south by about fifty feet east and west. Immediately south of this open space is a railroad track running east and west, which occupies the south half of Sharp avenue. South of the railroad track is another open space about twenty-five feet north and south and extending up and down the railroad quite a distance. Still further south and in line with the new house is a lumber shed, and further south beyond the lumber shed the north bank of the Wabash river is located, which is three hundred and fifty feet from the back porch of the new house. The new house is a one-story frame house, consisting of five rooms. The old house is a story-and-a-half frame, with five rooms on the first floor. The extreme west room of the old house projects west three or four feet further than the main body of the building. There is a window in the west room of the old house in the center of the west end. The floor of the back porch of the new house is about twenty inches above the ground level and is reached by three steps on the south side. This porch is four feet ten inches by seven feet six inches. The door opens from the porch into a room in the new house, and west of the door and porch there is a window. West of the old house and on the west line of the open space above described is located the ice house, which has double doors and a double window facing eastward toward the open space referred to. The new house above described was occupied by the plaintiff in error and his mother as a residence. The old house was rented to a woman by the name of Garrison, who kept a house of prostitution therein.

Richard Conrad testified that on the night that Showalter disappeared, about 10 or 10:30 in the evening, he

and a girl by the name of Oma Johnson were about one hundred feet south of the porch of the new house, near a lumber pile; that his attention was attracted to the porch of the new house by hearing plaintiff in error call to the deceased (Showalter) to stop; that upon looking in that direction he saw Showalter come out of the door of the new house, followed by the plaintiff in error; that he saw the plaintiff in error hit Showalter with some sort of a bludgeon similar to a base ball bat; that plaintiff in error struck the deceased with the club or stick on the head and knocked him down on the porch. He testifies that there was a light in the house and that the south door was open, and that the men were on the porch between him and the light. He testifies that after Showalter fell from the effect of the first blow, plaintiff in error hit him the second time; that Showalter struggled and was trying to get up when he received a second blow; that the plaintiff in error then stooped down and appeared to be taking something out of the deceased's pockets; that plaintiff in error then picked up the body of the deceased and carried it south, passing within twelve feet of where the witness stood, and took the body down to the river, and he did not see plaintiff in error after that. Oma Johnson, the girl that was with Conrad, testifies to the same state of facts as Conrad details, except she says that plaintiff in error was assisted in carrying the body to the river by his mother, Margaret Lucas. She also testifies that before carrying the body, a cloth or quilt of some kind was wrapped around the body. The witness Conrad testifies that plaintiff in error gave him $35 the next day after the disappearance of the deceased and told him to keep quiet, and that the witness promised to do so; that afterwards plaintiff in error paid him various sums of money; that the witness Conrad was subsequently arrested, charged with rape, and was sent to the reformatory at Pontiac for that offense and was undergoing his sentence for said offense at the time when he delivered his

testimony in this case. He testifies that plaintiff in error came to him after he was in jail, and before his trial, and told him that he would do everything in his power to get him out of his trouble, and that there was no use of his bringing trouble on plaintiff in error because he (Conrad) was in trouble. He admitted in his testimony that plaintiff in error had never made any effort to secure his release from the reformatory.

Myrtle Mercer testified that she worked at the Fifth Avenue Hotel, in Mt. Carmel, doing dining-room work there; that on the day that Showalter disappeared she called at the house of Margaret Lucas to see about some sewing; that she was there in the afternoon. She testifies that as she returned to the hotel, plaintiff in error pointed out Showalter to her and said, "There is a fellow named Showalter and he would like to meet you;" that she replied that he did not look good to her. She testified that Margaret Lucas asked her to come back in the evening and that she did return to the Lucas house about half-past eight, and that when she arrived there on this occasion she was accompanied by Irene Brady; that when she arrived at the Lucas house she found plaintiff in error, his mother and Showalter there; that they were engaged in friendly conversation; that Showalter said to her that he wanted to see her, and the two went into another room and closed the door but did not lock it; that shortly afterwards plaintiff in error came to the door and asked what was the matter, to which the witness replied, "Nothing at all," and thereupon Jesse Lucas said, "I will get Showalter;" that Showalter then went out of the door behind Jesse and Jesse went out and the deceased went out on the porch on the south side of the new house; that the next thing Myrtle Mercer heard was Showalter saying, "Don't kill me, Jesse!" followed by a blow, and that the witness then saw Showalter lying on the edge of the porch; that after this occur-

244—39

rence Myrtle Mercer and Irene Brady went out at the door and went back to the hotel where Myrtle Mercer worked.

Irene Brady did not testify in the case. It is stated in the brief for plaintiff in error that she is out of the State of Illinois and her whereabouts is unknown.

Ruth Henson testified that she was living in the old house, which has already been described, on the night that Clyde Showalter disappeared; that plaintiff in error came into the old house after supper,—about eight o'clock or a little later; that at that time Mollie Garrison, who was keeping the old house with the witness, was not at home; that Jesse Lucas came in and remained only a few minutes and then went back to his own home, the new house; that the witness did not see him again until after the killing of Showalter. She testifies that she was in the west room of the old house at the time of the difficulty on the porch of the new house; that she was standing near the window facing toward the open space between the old house and the ice house; that the window was up; that she saw plaintiff in error and his mother pass the window carrying the body of the deceased; that they passed very close to the window; that she heard, some time before this, a cry of distress and heard something like a blow. She further testified that the next morning she had a talk with Margaret Lucas, in which the latter told her that if she heard anything the night before she had better keep still. This witness and the Garrison woman left the next day for Evansville, Indiana, and have not resided in Mt. Carmel since.

The foregoing is the substance of the evidence on behalf of the People. Plaintiff in error and his mother both testified directly opposite and positively contradict all of the witnesses for the People. They deny that Showalter was at the new house on the night in question and testify that they were at home and ate supper together about six P. M. They state that after supper the plaintiff in error went over to the old house at the request of the Garrison

woman to stay with the Henson girl while Mrs. Garrison went on an errand; that he returned home about 9:30 and went to bed, and that he and his mother slept in the house alone the whole of that night. They deny that Myrtle Mercer and the Brady girl were at their house at any time during that afternoon or evening, and also deny having seen the deceased at any time or place during the afternoon or night on which he disappeared. They contradict Conrad, Oma Johnson and the Henson girl in regard to their carrying the body to the river and deny any knowledge or connection with the murder of Showalter.

In addition to the denial of all the incriminating evidence by the two defendants, some other evidence is introduced on their behalf which tends to contradict and impeach some of the witnesses for the People. The most important evidence of the latter class was given by Mr. White, who testifies that he was a watchman for a saw-mill and lumber yard in close proximity to the Lucas houses, and that he went on duty on the night in question at seven o'clock and remained on duty until seven o'clock the following morning; that during the entire night he had occasion to pass around in the vicinity of the Lucas houses and to observe what was going on in that neighborhood; that he passed the new house as much as twenty times during the night, and that he saw no light at any time in the new house and heard no noise or disturbance of any kind about that building; that he saw no person about the lumber pile, at any time during the night, where Conrad and Oma Johnson claim to have been, and that he saw no such occurrence as the carrying of a body, or anything of that kind, down to the river from the Lucas house. His testimony is mainly of a negative character, and while it seems strange that the deceased could have been killed on the porch of the new house and his body carried to the river in the manner described by the witnesses for the People without White knowing anything about it, yet it is possible

that the transactions may have happened without White's knowledge. This witness testifies that there was singing and dancing going on in the old Lucas house from ten o'clock in the evening until two o'clock in the morning, but he says that this was nothing unusual and he paid no particular attention to it. He also testifies that about two o'clock in the morning some one driving a gray horse hitched to a buggy drove up and hitched the horse near the old house and went into the house. He testifies that he thinks the horse belonged to Clint Rigg but he did not know who was in charge of it on that occasion. There is no particular significance to be attached to this circumstance. This witness also testifies that about eight o'clock in the evening plaintiff in error came to him in the lumber shed and talked with him about one-half hour; that plaintiff in error asked him to wake him up at two o'clock; that plaintiff in error wanted to meet some women that were coming in on the night train, but the witness told him that he could not wake him, and he testifies that he did not call plaintiff in error as he was requested to do. Plaintiff in error in giving an account of his whereabouts on the night in question fails to mention his visit to Mr. White at the lumber yard. In addition to this evidence it was also shown by a number of witnesses that they had gone in the night time to the place where Conrad and the Johnson girl say they were at the time the killing occurred, and that these witnesses experimented by placing two men on the porch of the new house and placing a lamp inside the room next to the porch, and they all testify that it was wholly impossible to identify the persons on the porch. They all agree, however, that they could see the bulk of the men on the porch and could tell when they moved around, but could not see their faces well enough to be able to identify them.

Physicians testify that a blow on the head with a ball bat or other club of like character, sufficient to produce

instant death, would fracture the skull bone. It was not shown whether the skull of the deceased had been fractured. There was no examination made and no evidence one way or the other upon this question.

The foregoing is a general outline of the most important facts proven on the trial.

Plaintiff in error first contends that the court erred in overruling the motion to quash the first and second counts of the indictment. These two counts, as already shown, charge the plaintiff in error with the commission of the crime and in a separate paragraph charge his mother with being an accessory before the fact. This form of indictment has never, to our knowledge, been passed on by this court. Under our statute an accessory before the fact is indictable and punishable as a principal, and it is usual to indict an accessory before the fact as a principal, as was done in this case by the third count. While the form employed in the first and second counts is unusual, still we are unable to see why those counts are not good. The facts charged against Margaret Lucas, if proven, would make her guilty as a principal, and the indictment concluded by charging both of the parties as principals in the commission of the crime. The cases of *State* v. *Hopper,* 71 Mo. 425, and *State* v. *Stacy,* 103 id. 11, are authorities directly holding that an indictment in the form of the first and second counts in this indictment is free from any valid objections. No authorities are cited by the plaintiff in error wherein it is held that the indictment in this form is bad. We do not see wherein any right of the accused or principle of pleading is violated by the form of this indictment. There are some other objections made to the indictment by the plaintiff in error but we do not regard any of them as tenable.

Plaintiff in error complains that the witness Conrad was permitted to testify to statements made by Jesse Lucas after the commission of the crime alleged, and that

other witnesses were permitted to testify to like statements made by the other defendant. The complaint is, not that this evidence was not proper against the particular defendant making the statements, but that the court should have given an instruction limiting the application of such testimony to the defendant making the alleged statements. The alleged error in this regard is not properly presented for review, since it nowhere appears that any such instruction was requested on behalf of either of the persons on trial. Had such instruction been asked it would have been proper and the court would presumably have given it, but it was not the duty of the court, of its own motion, to prepare and give an instruction on behalf of the defendants without any request for that purpose.

The observations just made dispose of the complaint of plaintiff in error in regard to the failure of the court to instruct the jury in regard to the offense of manslaughter. No such instructions having been asked by plaintiff in error, the court had a right to assume that plaintiff in error preferred to submit the case to the jury in such way that the jury would be compelled to find the defendants guilty of murder or not guilty. It was the right of plaintiff in error to submit that question to the jury and require the jury to pass on the question of his guilt or innocence of the crime of murder, and it was not the duty of the court to submit issues and questions to the jury which the parties, by their action, said they did not desire passed upon. This court has often held that it is the duty of the court to pass on and give or refuse such instructions as are asked by the parties, and that a party cannot complain of the failure of the court to give an instruction unless it has been prepared and tendered for that purpose. *Drury* v. *Connell,* 177 Ill. 43; *Osgood* v. *Skinner,* 211 id. 229.

Plaintiff in error, while conceding that the rule above announced is applicable in civil cases, contends that it does not apply in criminal trials; that the court owes a duty in

this regard to one being tried for a criminal offense that is not due to a party to a civil cause. No such distinction is recognized by this court. The rule is the same in criminal trials on this subject as it is in civil causes. *Dunn* v. *People*, 109 Ill. 635; *Spies* v. *People*, 122 id. 1.

Plaintiff in error contends that instruction No. 3 given on behalf of the People is erroneous. That instruction is intended to define the term "reasonable doubt," and advises the jury that that term means, in law, "a serious, substantial doubt and not a mere possibility of a doubt." The instruction then proceeds, in separate paragraphs, to amplify the meaning of "reasonable doubt" by stating what is a reasonable doubt and what is not such doubt. The objection to this instruction is mainly directed to the sixth paragraph, which recites that "it [reasonable doubt] must not be based upon a mere possibility that the defendant may be innocent, for the court instructs the jury that it may be possible that the defendant is innocent and yet at the same time there may be no reasonable doubt but that he is guilty." We fail to see the force of the objection made to this instruction. It is not the law, as plaintiff in error seems to suppose, that the People are required to establish guilt in a criminal case beyond the possibility of a doubt. If such were the rule it would be very difficult to ever secure a conviction in a criminal case. A state of facts can hardly be imagined which excludes the possibility of a doubt as to the conclusion to be drawn therefrom. This clause of the instruction is supported by the decision of this court in *People* v. *Depew*, 237 Ill. 574.

Plaintiff in error further contends that the court erred in giving instruction No. 10 on behalf of the People. That instruction is as follows:

"Malice is not confined to ill-will toward an individual but is intended to denote an action following from any wicked and corrupt motive,—a thing done with a wicked mind,—where the fact has been attended with such circum-

stances as evince plain indications of a heart regardless of social duties and fatally bent on mischief; hence malice is implied from any deliberate and cruel act against another, however sudden, which shows an abandoned and malignant heart."

It is said that this instruction was held erroneous by this court in the case of *Marzen* v. *People,* 173 Ill. 43. This is a misapprehension on the part of plaintiff in error. The instruction in the *Marzen case* is not similar to the instruction complained of in the case at bar. In the *Marzen case* the instruction advised the jury that the words "malice aforethought" did not mean deliberation, and this court held that it is the deliberation with which an act is performed that gives it character; that it is the opposite of an act performed in uncontrollable passion, which prevents the deliberation or cool reflection in forming a purpose. There is nothing said in the *Marzen case* that condemns instruction No. 10. On the contrary, the reasoning of the court there supports the instruction now under consideration. There was evidence in the record, if the jury believed the testimony of Myrtle Mercer, of express malice, but rejecting her testimony as to the threat made by plaintiff in error, there is evidence, if the testimony of the other eye-witnesses is accepted, that furnishes a basis for implied malice. There was no error in giving either the third or tenth instruction. No other instructions are complained of.

The final complaint of the plaintiff in error is, that the court erred in overruling the motion for a new trial on the ground that the verdict is not supported by the evidence. The substance of the evidence has already been stated. The point made by plaintiff in error, it will be seen, resolves itself into a question of the credibility of the witnesses. If the witness Conrad and the three girls who corroborate him speak the truth, then plaintiff in error is clearly proven guilty. The plaintiff in error, realizing that

his conviction would necessarily follow if the jury believed the evidence of these eye-witnesses, sought to contradict, impeach and discredit them. It must be conceded, we think, that the evidence and circumstances introduced tend to impeach the credibility of these witnesses to some extent, yet there appears to be no motive why they would desire to falsely and wrongfully accuse plaintiff in error of so serious an offense as their evidence establishes against him.

Finding no reversible error in this record the judgment of the circuit court of Wabash county is affirmed.

*Judgment affirmed.*